IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CARLO MORETTI, | § |
| | § |
| Petitioner, | § |
| | § |
| v. | § |
| | § Civil Action No. _____ |
| GIGLIANNE CAROLLINNE | § |
| SEVERINO BRAGA, | § |
| | § |
| Respondent. | § |

**VERIFIED COMPLAINT AND PETITION FOR RETURN OF CHILD**

COMES NOW Petitioner Carlo Moretti ("Mr. Moretti" or "Petitioner"), by and through his undersigned counsel, and submits this, his Verified Complaint and Petition for Return of Child against Respondent Giglianne Carollinne Severino Braga ("Ms. Braga or "Respondent"), respectfully showing the Court as follows:

## I.     INTRODUCTION

1. Mr. Moretti brings this action under the United Nations Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 19 I.L.M. 1501, (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* ("ICARA"). The Hague Convention came into effect in the United States on July 1, 1988, and has been ratified between the United States, Italy, and over 80 other Contracting States.

2. The Hague Convention and ICARA have two overarching purposes: to (a) "secure the prompt return of children wrongfully removed to or retained in any Contracting State" and (b) "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other contracting States." Hague Convention, art. 1(a)–(b).

1

3.      The Hague Convention and ICARA provide a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention. *See id.*, art. 11 ("The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.").

4.      One goal of the Hague Convention and ICARA is to prevent forum shopping by returning the child to his or her home jurisdiction so that a custody determination can be made there. To that end, courts outside the child's original home country are precluded from considering the merits of the underlying custody dispute.

5.      Mr. Moretti and Ms. Braga have a four-year-old daughter together, A.M. (the "Child").[1]

6.      Ms. Braga, under the guise of a "vacation," obtained Mr. Moretti's consent to remove A.M. to the United States. Ms. Braga has since wrongfully retained A.M. in the United States and, after moving on multiple occasions, now resides with A.M. in the Northern District of Texas.

7.      Through this action, Mr. Moretti seeks to secure A.M.'s return to Italy as required by the Hague Convention and ICARA.

## II.    JURISDICTION AND VENUE

8.      Mr. Moretti is a citizen and resident of Italy.

---

[1] Pursuant to Federal Rule of Civil Procedure 5.2(a)(3), only the initials of the minor Child are provided. To the same end, redactions have made to supporting exhibits as necessary to conceal the minor Child's full name. The undersigned will provide the full name of the Child in a sealed filing. In the same sealed filing, the undersigned will provide the current residential address for Respondent and the Child for the purposes of establishing jurisdiction and effectuating service as requested in Petitioner's prayer.

2

9. Ms. Braga is a dual citizen of the United States and Brazil, who, on information and belief, now resides with the Child in Dallas, Texas.

10. This Court has jurisdiction over this case pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

11. Venue is proper pursuant to 22 U.S.C. § 9003(b) and 28 U.S.C. § 1391(b) because, upon information and belief, A.M. is currently located in Dallas County, which is in the Northern District of Texas.

### III. STATEMENT OF FACTS

**A. A.M.'s Country of Habitual Residence is Italy.**

12. A.M. was born in Vicenza, Italy in late 2018.[2] Mr. Moretti is her father and Ms. Braga is her mother.

13. When A.M. was born, she, Mr. Moretti, and Ms. Braga all lived together at Mr. Moretti's residence in Vicenza. During this time, both parents cared for A.M. and Mr. Moretti worked to support the family. Mr. Moretti paid for A.M's food, clothing, toys, as well as for A.M. to attend to attend nursery school in Vicenza.[3] Mr. Moretti and Ms. Braga both took A.M. to visit her pediatrician in Vicenza as well.[4]

14. In early-to-mid-2020, disagreements arose between Mr. Moretti and Ms. Braga and the two ended their romantic relationship.

---

[2] A redacted copy of A.M.'s certificate of family status, residence, and citizenship, provided by the Municipality of Vicenza in both Italian and English is attached hereto as Exhibit 1.

[3] A letter evidencing A.M.'s attendance at nursey school in Vicenza and an English translation is attached as Exhibit 2. A certification of translation for Exhibits 2–6 is attached as Exhibit 7.

[4] A letter evidencing A.M.'s doctor's visits in Vicenza and an English translation is attached as Exhibit 3. A certification of translation for Exhibits 2–6 is attached as Exhibit 7.

15. Ultimately, the Parties agreed that Ms. Braga and A.M. would move out of Mr. Moretti's apartment and into another unit at the same complex. The unit was one floor below Mr. Moretti's residence and was owned by Mr. Moretti's family. This arrangement allowed Ms. Braga to live separately (and rent free) from Mr. Moretti and also allowed Mr. Moretti to see A.M. daily.

16. After moving into the apartment below Mr. Moretti's, Ms. Braga decided that she wanted to move somewhere outside the apartment complex to have more distance between herself and Mr. Moretti's family (some of whom were also living at the same apartment complex). Because Ms. Braga did not have an income, Mr. Moretti paid for Ms. Braga and A.M. to move to a new apartment in Vicenza.

17. Around this time, Mr. Moretti was concerned that Ms. Braga, whom he knew to be nomadic by nature, would move with A.M. outside the country without notifying him. For this reason, Mr. Moretti requested that Italian officials place a hold on A.M.'s passport preventing her from leaving the country without his consent.

18. In September 2021, Ms. Braga decided to move again, this time to Milan, Italy. According to Ms. Braga, this move was necessary so that she could find stable employment. Mr. Moretti consented to the move to avoid conflict with Ms. Braga and to promote the best interests of A.M. Because Ms. Braga could not get approved for an apartment on her own, as she still had not obtained stable employment, Mr. Moretti leased an apartment for her and A.M. in Milan, paid to help Ms. Braga and the Child move to Milan, and paid the rent on the Milan apartment

each month.[5] He did so on the condition that he be permitted access to one room in the apartment that he could sleep in overnight so that he could spend time with A.M. during the week.

19. After A.M.'s move to Milan, Mr. Moretti, though still residing in Vicenza, continued to care for A.M. He paid for A.M. to begin attending a new nursery school in Milan.[6] He traveled to Milan weekly and stayed multiple nights each week with A.M. and Ms. Braga at the Milan apartment. On alternating weekends, he also took A.M. to stay with him in Vicenza by agreement with Ms. Braga.

20. In late 2021, the Parties went on a vacation together with A.M. On that vacation, the Parties shared a hotel room with two beds. To Mr. Moretti, this vacation was indicative of the Parties' ability to work together as parents and to maintain a friendly coexistence.

21. After several months operating under an agreed, informal routine, the Parties aspired to memorialize their custody/support rights and obligations and, to that end, each obtained counsel to represent their interests. After negotiating terms, the Parties signed a draft custody and child support agreement providing that: (1) each would share custody of A.M.; (2) A.M.'s registered address would remain Mr. Moretti's Vicenza home; (3) Mr. Moretti would be permitted to see and stay with A.M. (a) at the Milan apartment every week from Thursday evening until Saturday morning, (b) at his Vicenza home on alternating weekends and for three weeks during the summer holidays, and (c) at his Vicenza home in alternating years during the seven day period between Christmas and New Year's Day and for three days during the Easter holiday; and (4) Mr. Moretti would pay Ms. Braga € 350.00 per month to support monthly to

---

[5] A copy of Mr. Moretti's lease for the Milan apartment and an English translation is attached as Exhibit 4. A certification of translation for Exhibits 2–6 is attached as Exhibit 7.

[6] The unsworn declaration of Delores Cicoria, the owner of A.M.'s nursery school in Milan, and an English translation is attached as Exhibit 5. A certification of translation for Exhibits 2–6 is attached as Exhibit 7.

support the Child and would cover 100% of the Child's private nursey school costs (€ 750.00 per month at the time) and 50% of any extraordinary expenses. The parties also agreed that Ms. Braga would begin contributing to the rent payments for the Milan apartment, which Mr. Moretti had been paying at a cost of € 1,350 per month. The agreement was signed December 9, 2021.[7]

22.  Around the time the Parties signed the draft custody agreement, Ms. Braga informed Mr. Moretti that she wanted to take A.M. to Dallas to visit family over the Christmas holiday. Ms. Braga told Mr. Moretti that she had purchased airline tickets for her and A.M. to depart from Milan on December 16, 2021, and return on January 4, 2022, and even sent Mr. Moretti flight confirmations evidencing the same.[8] Trusting Ms. Braga's word, Mr. Moretti returned to the Italian passport office to release the hold on A.M.'s passport so that Ms. Braga could take A.M. to visit Ms. Braga's family in Irving over the holidays.

**B.  Ms. Braga Has Wrongfully Retained A.M. in the United States.**

1.  <u>Ms. Braga's Wrongful Retention of A.M. in the United States</u>.

23.  While Ms. Braga and A.M. were on vacation in Dallas, Ms. Braga kept in close contact with Mr. Moretti. The day Ms. Braga and A.M. were scheduled to return from their vacation in the United States, Ms. Braga sent Mr. Moretti a picture of A.M. fast asleep laying on a bed. Mr. Moretti found this peculiar because he expected that A.M. would be on a plane or at the airport on the way home. Mr. Moretti responded to the picture by asking where Ms. Braga and A.M. were. Ms. Braga replied, stating that she needed to tell Mr. Moretti something over the

---

[7] A true and correct copy of the signed agreement and an English translation is attached as Exhibit 6. A certification of translation for Exhibits 2–6 is attached as Exhibit 7. Because Ms. Braga would abscond with A.M. to the United States just eight days after signing the custody agreement, the agreement was not filed with an Italian court.

[8] A true and correct copy of Ms. Braga's email to Mr. Moretti confirming her flight itinerary is attached as Exhibit 8.

phone. When Mr. Moretti answered Ms. Braga's call, she explained that neither she nor A.M. would be returning to Italy. During that call, she informed him that she had lied when she called the trip a vacation and actually planned to move A.M. to the United States permanently.

24. Mr. Moretti was angry, confused, and hurt. He could not understand why Ms. Braga would take his daughter from him after all he had done to support them both. Indeed, at every step, Mr. Moretti supported Ms. Braga's decisions both emotionally and financially. Frustrated, Mr. Moretti hung up the phone and refused to answer Ms. Braga's calls.

25. Unable to reach Mr. Moretti by phone, Ms. Braga opted to explain herself via WhatsApp message. Recognizing her wrongful behavior, she opened with an apology:

> Carlo,
>
> I write to you as I return back to the US w [A.M.]. I'd like to ask for your forgiveness and I believe you need mine too. You said you will always back me up, please do. . . .[9]

26. This moment of self-reflection was short lived, however, as Ms. Braga began to rant about the perceived threat inspiring her decision—the Italian government's COVID-19 response:

> [A.M.] was not born into the new world order covid agenda and I won't pretend that this is the new real. I speak like many escaping and migrating to free red states as my life has become unlivable in Italy. My American Passport that my mom worked so hard for literally saved mine and [A.M.]'s life.
>
> You spoke many times of fighting for kids, our daughter, if forced the experimental MRNA-well they are not exempt, so what are you going to do about it, superman? The creator of this technology, Dr. Malone is now removed from Twitter for speaking out of the the [sic] dangers ahead. You can't possibly prefer [A.M.] to be experimented on? Permanently in a state of fear behind a mask? Think about [A.M.]'s learning since she's been in school, only w masked teachers, it's so messed up all while it's scientifically proven not to work but definitely hinder the education of children. [A.M.] won't be our smart little girl for long, just submissive, docile,

---

[9] True and correct copies of Ms. Braga's January 5, 2022 WhatsApp messages to Mr. Moretti are attached as Exhibit 9. The messages are not translations—they were originally sent in English.

7

> shy, obedient little governments child if we stayed in Europe. There is no money in ending this insanity. Are you sure that you're believing in science? You're beginning to think lockdowns are normal, please wake up from this mass psychosis motto.
>
> I have found an international lawyer working w American mothers, [A.M.] is in physical and psychological danger due to nonsensical and non scientific covid restrictions, we are a refuge family escaping forced vaccines for profit. In other words, child abuse and crimes against humanity. Sounds like propaganda.
>
> I fear you have fallen into this tyranny trap and will be forced vaccines forever. Life subscriptions and microchips no longer a conspiracy eh? We have a huge chance of surviving covid (like the flu) but definitely a bigger chance of getting hurt by these jabs. Omicron is mild and people should embrace herd immunity yet what are many governments doing instead? Scaring us senseless into one global program! Now telling everyone you will still get covid but less sever covid if your covid comes from someone also vaccinated, wtf? Why are the numbers much different in Africa? Does science really mean different things depending where in the world you are? Should corrupt powers dictate science or is open information necessary? How much tax dollars are being misused and stolen for Big Pharma gain in wealthier countries? It's impressive and disgusting at the same time, right? C'mon even people w awful reactions from the first dose are being forced the second dose and natural immunity is suddenly scientifically insufficient. Does science now change if you're sitting vs standing while wearing a silly mask-for the fukn greater good or is mankind being conned? These fraudulent companies running government have openly stated that they are testing on us and refuse to keep track of side effects that we now see and unfortunately still remain to see, pretty much saying they don't give a fuck what happens to us that it's profit over people. Censoring everyone against the regime like China. It's being rebranded now, from fake news to good and bad news. Hey boys and girls, listen to us, we're good news!! So has everyone taken the newest medication? Only some companies permitted so not to saturate profit shares of drugs that don't work well? Bill Gates says there will be more (man made!) pandemics and he's betting on "vaccines", believe it. They're going to ruin your immune system while telling you that critical thinking is basically illegal. Seriously matto, what's the price?
>
> I must think of [A.M.]'s safety and growth. Life means nothing if [A.M.] is experimented on and a scared little kid behind a mask, also no liability chance she is injured plus possible death. Milan is no longer important amongst green pass/social credit score zombies, my natural health and dignity prevails . . . .

27. Ms. Braga next recounted an interaction with A.M. that she interpreted as

confirming her decision, and compared her circumstances with others:

> A few weeks ago, [A.M] was humming/singing in her sleep for many minutes then a woman's voice came out of her and said "save me, be careful" I tell you this as I begged the universe to protect us in this big decision. [A.M.] is my life, [A.M.] is life. I will not sacrifice my child nor mask her during ballet class. Finito! You know I love [A.M.] so much, trust me that some mother's love their children more than others.
>
> You have friends . . . whom willingly sheep their own children to stay accepted. You have friends like . . . who says he has no other choice though he would choose differently. Then you have me, I had one last option and I'd be stupid not to take it. US has to accept unvaccinated American citizens back into the country regardless of pharmaceutical greed and power play because they know it's illegal and the biggest scam of all time . . . .

28. Taking a break from her diatribe, Ms. Braga next threatened Mr. Moretti with litigation if he attempted to enforce his parental rights:

> We came as refuge and I'll continue to seek my lawyers advice if you dare think sacrificing our daughter makes you a better man. [A.M.]'s passport is locked.

29. Ms. Braga then began to talk logistics, confirming that she had planned to wrongfully retain A.M. in the United States from the very start:

> I ask for no money from you not even [A.M.]'s allowance just your patience and love. You should have plenty to save for visits, you can still be the wonderful dad that only you can be to [A.M.]. [A.M.] deserves nature and truth as do we. We are currently in upstate NY at my aunts place and she will continue to support me for the next few months as we make plans for the near future. She only has goodness in her heart, she looks forward to meeting you and fighting for everyone's freedom.
>
> Credit in Italy seems quite silly (but don't worry chinese social credit score has begun) so I will talk to Michael about rent ending on the first of February. Please use [A.M.]'s school money for rent now in January. I have arranged for some people to clear the apartment but there may be a few things for you to grab if you want.

30. Ms. Braga closed by declaring her intent to move to "Free Florida," proposing that Mr. Moretti marry her, and reciting an Aldous Huxley quote:

> I need you, Carlo, and some day you may need me, be it for work or your own freedom.
>
> Will you marry me?

9

Giglianne

"Medical science is making such remarkable progress that soon none of us will be well."
--Aldous Huxley

31. Mr. Moretti was stunned. He knew Ms. Braga was outspoken in her criticism of the Italian government's COVID-19 response, but she never asked for or received his consent to move A.M. to the United States on that basis (or any other). Moreover, Mr. Moretti was particularly frustrated and confused by Ms. Braga's months-long plot to deceive him into providing his consent to take A.M. out of the country. Not only had Ms. Braga breached the custody agreement she had signed just weeks before, but her conduct ran directly contrary to Mr. Moretti's perception of the Parties' relationship at the time—best evidenced by their ongoing commitment to co-parent in a way that supported A.M.'s best interests.

32. Mr. Moretti was seriously concerned that Ms. Braga might prevent him from seeing A.M. again. As far as he knew, A.M. was unlawfully retained in foreign country where he was not a citizen.

33. As his only access to his daughter was through the very person responsible for her unlawful retention in the United States, Mr. Moretti knew he needed to maintain a civil relationship with Ms. Braga in order to have access to A.M.

34. Thus, although he declined Ms. Braga's marriage proposal, Mr. Moretti worked to maintain some semblance of a co-parenting relationship with Ms. Braga. He also believed that he could convince Ms. Braga to return to Italy as the pandemic waned and Italy began rescinding and lowering COVID-19-inspired restrictions.

35. However, from the first phone call when Ms. Braga first informed Mr. Moretti of her intention to remain in the United States with A.M. Mr. Moretti remained clear with her that she did not have his consent to do so. At no point from that phone call to the present did Mr. Moretti consent or acquiesce to A.M.'s retention in the United States.

2. <u>Ms. Braga's Repeated Displacement of A.M. Post-Retention.</u>

36. From the date Ms. Braga wrongfully retained A.M. in January 2022 until July 2022, the two stayed with Ms. Braga's aunt in Hillsdale, New York.[10] Ms. Braga explained her original plan to Mr. Moretti as one where she and A.M. would live with the aunt for twelve months— enough time for Ms. Braga to establish her own economic independence. But this plan was cut short when, six months in, disagreements arose between Ms. Braga and her aunt and her aunt ordered her to leave.

37. No longer able to stay with her aunt, Ms. Braga decided to move with A.M. to Irving, Texas to live with Ms. Braga's mother and brother. This home was especially attractive because Ms. Braga would be able to earn an income working on the Braga family farm. However, because Ms. Braga did not have a car, she did not have a way to transport A.M. and their things to Irving. Ms. Braga made it clear to Mr. Moretti that she would find a way to transport herself and A.M. to Irving, regardless of safety risks involved, so to ensure his daughter's safety, Mr. Moretti paid for a rental car for Ms. Braga. Ms. Braga used that rental car to drive herself and A.M. across the country. Because Ms. Braga could not afford a hotel, she opted to sleep in a tent with A.M.— stopping at various unknown locations between Hillsdale and Irving to do so. Mr. Moretti, who

---

[10] Ms. Braga originally took A.M. to visit family in Irving, Texas, but had flown to New York and was staying with her aunt by the time she revealed her intentions to Mr. Moretti.

was already concerned about A.M.'s lack of stability, then also became extremely concerned about A.M.'s physical safety.

38. After arriving in Irving Ms. Braga remained living with her mother and brother for only a few weeks prior to leaving after some ongoing arguments with her brother.

39. When Ms. Braga left this living arrangement, she also gave up the opportunity to work on the family farm and earn a living.

40. Having exhausted her options to stay with family, Ms. Braga next moved with A.M. to an apartment in Dallas, Texas. Like her previous five residences (Vicenza apartment 1, Vicenza apartment 2, Milan, Hillsdale, and Irving), Ms. Braga is not financially responsible for the rent. On information and belief, the Dallas apartment is paid for by Ms. Braga's mother.

41. Moreover, in messages with Mr. Moretti, Ms. Braga indicated her interest in purchasing an R.V. for her and A.M. to live in.[11] Not only would this further deprive A.M. of stability, but Mr. Moretti is also concerned about the inherently portable nature of this home which would make it difficult for him to enforce his custody rights and easier for Ms. Braga to further abscond with A.M., potentially hiding the A.M.'s whereabouts from Mr. Moretti completely.

3. <u>Ms. Braga's Retention of A.M. in the United States Violates Mr. Moretti's Rights of Custody under Italian Law.</u>

42. Mr. Moretti has rights of custody under both the parties' custody agreement and under Italian law,[12] and had them at the time Ms. Braga first wrongfully retained A.M. in Italy.

---

[11] True and correct copies of these messages are attached as Exhibit 10. The messages are not translations—they were originally sent in English.

[12] To determine whether a party has "rights of custody" "courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had 'rights of custody.'" *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004). Here, the country of habitual residence is Italy.

43. Article 316 of the Italian Civil Code provides that "[b]oth parents have child custody that is to be exercised with mutual agreement between them . . . ."[13] *Spica v. Viera*, No. 20-cv-21284, 2020 U.S. Dist. LEXIS 265245, at *12–13 (S.D. Fla. June 22, 2020) (quoting It. Civ. Code art. 316); *De Lucia v. Castillo*, No. 3:19-cv-7, 2019 U.S. Dist. LEXIS 71303, at *22–23 (M.D. Ga. Apr. 29, 2019). It also states that "[t]he parents shall mutually agree on the habitual residence of the minor children." *Spica v. Viera*, No. 20-cv-21284, 2020 U.S. Dist. LEXIS 265245, at *12–13 (S.D. Fla. June 22, 2020) (quoting It. Civ. Code art. 316); *De Lucia v. Castillo*, No. 3:19-cv-7, 2019 U.S. Dist. LEXIS 71303, at *22–23 (M.D. Ga. Apr. 29, 2019).

44. Ms. Braga's unilateral decision to move A.M.'s primary residence to the United States, without Mr. Moretti's consent, thus violates Mr. Moretti's rights of custody under Italian law.

45. Ms. Braga cannot reasonably refute Mr. Moretti's rights of custody.

### C. Mr. Moretti Was Exercising His Rights of Custody at the Time of the Wrongful Retention.

46. Mr. Moretti was exercising his right of custody at the time A.M. was first retained in the United States.

47. Before Ms. Braga removed A.M. to the United States, Mr. Moretti spent several days each week cohabitating with A.M. and providing for her care. He paid for her schooling, housing, and ensured that she had food, toys, and healthcare.

48. But for A.M.'s wrongful retention in the United States, Mr. Moretti would continue exercising his full rights of custody.

---

[13] A true and correct copy of Article 316 of the Italian Civil Code and an English translation thereof is attached as Exhibit 11.

49. Even since the wrongful retention, Mr. Moretti has continued to fulfill his parental responsibilities to A.M. He has incurred tremendous expense booking international flights to visit A.M. on four occasions (twice in New York, and twice in Texas); he sends messages to her on WhatsApp; he arranges for A.M. to speak with her friends and family back in Italy; he continues to pay for her health insurance;[14] he pays for A.M. to attend ballet classes, swimming lessons, and other activities; and he sends Ms. Braga $500 each month to ensure the well-being of his daughter.[15] Mr. Moretti does not pay for Ms. Braga's rent because he refuses to support Ms. Braga's continued retention of A.M. in the United States.

50. Each time he visits A.M., Mr. Moretti implores Ms. Braga to return A.M. to her home in Italy. Mr. Moretti remains concerned that his attempt to enforce his parental rights will inspire Ms. Braga to prevent him from visiting his daughter. But as time has passed, and as Mr. Moretti has been forced to sit by while Ms. Braga repeatedly displaces A.M. and ignores his pleas for A.M.'s return, Mr. Moretti has concluded that he had no choice but to resort to litigation.

51. On December 7, 2022, Mr. Moretti filed an application under Hague Convention with the United States Department of State seeking assistance with obtaining A.M.'s return to Italy. The State Department referred this matter to the undersigned counsel for the purposes of filing the instant action.

52. Again, Ms. Braga cannot reasonably refute that Mr. Moretti exercised, and still exercises, his custody rights.

---

[14] A true and correct insurance certificate evidencing Mr. Moretti's purchase of medical insurance for A.M. is attached as Exhibit 12. The certificate is not translated—it was provided to Mr. Moretti originally in English.

[15] A true and correct table of bank transfers evidencing Mr. Moretti's monthly payments to Ms. Braga is attached as Exhibit 13.

## IV.   CAUSES OF ACTION

### A. Count One– Claim for Relief Under the Hague Convention

53.   Mr. Moretti incorporates by reference all facts and allegations set forth in the foregoing paragraphs and further alleges the following:

54.   The Hague Convention and ICARA apply in this case because the Child is less than sixteen-years old and the United States and Italy are both "Contracting States" under the Hague Convention. Hague Convention, arts. 1, 4.

55.   The Hague Convention and ICARA require the return of children wrongfully removed to or retained in the United States to their home country. *See id.*, art. 12.

56.   The removal or retention of a child is wrongful when (a) it is in breach of the left-behind parent's rights of custody in the country where the child was habitually resident before removal and (b), at the time of the removal or retention, the left-behind parent was actually exercising those rights, either jointly or alone, or would have exercised those rights but for the removal or retention. *Id.*, art. 3.

57.   Rights of custody may arise by operation of law or by reason of a judicial or administrative decision. *Id*. Rights of custody include rights relating to the care of the child and, in particular, the right to determine the child's place of residence. *Id.*, art. 5(a).

58.   As shown above, A.M. was a habitual resident of Italy prior to her wrongful retention in the United states; thus, Italian law governs Mr. Moretti's rights of custody.

59.   As shown above, Mr. Moretti had rights of custody under a custody agreement and by operation of Italian law.

60. As shown above, Mr. Moretti was exercising his rights of custody prior to Ms. Braga's wrongful retention of A.M. in the United States and would have continued exercising those rights but for Ms. Braga's removal and retention of A.M.

61. The Hague Convention and ICARA therefore require that A.M. be returned to Italy so that an Italian court can make a custody determination.

B. **Count Two – Attorneys' Fees and Costs.**

62. Mr. Moretti incorporates by reference all facts and allegations set forth in the foregoing paragraphs and further alleges the following:

63. Pursuant to 22 U.S.C. § 9007, Mr. Moretti respectfully requests that this Court award him all necessary expenses incurred by or on behalf of Mr. Moretti, including court costs, legal fees, or other care during the course of proceedings in the action, and transportation costs related to the return of the Child.

## V. NOTICE

64. Mr. Moretti incorporates by reference all facts and allegations set forth in the foregoing paragraphs and further allege the following:

65. Pursuant to 22 U.S.C. § 9003(c), Respondent shall be given notice of this Petition in accordance with Rule 4 of the Federal Rules of Civil Procedure.

## VI. RELIEF REQUESTED

**WHEREFORE,** Petitioner Carlo Moretti prays for the following relief:

a) An immediate *ex parte* temporary restraining order ("TRO") (i) prohibiting the removal of the Child from the jurisdiction of this Court pending a hearing on the merits of this Petition, and further providing that no person acting in concert or participating

with Respondent shall take any action to remove the Child from the jurisdiction of this Court pending a determination on the merits of this Petition; (ii) ordering Respondent to surrender the Child's passports, visas, or other travel documentation to the Court for the duration of these proceedings; (iii) directing the United States Marshals Service to serve Respondent with a copy of this Complaint and the TRO, and to take possession of the Child's passports, visas, or other travel documentation, if available, at the time of service;[16]

b) The scheduling of an expedited preliminary injunction hearing on the merits of this Petition;

c) Pursuant to Federal Rules of Civil Procedure 40 and 65, 22 U.S.C. § 9003(d), and Article 2 of the Hague Convention (requesting that signatories to the Convention "use the most expeditious procedures available"), an order that the trial of the action on the merits be advanced and consolidated with the hearing on the preliminary injunction;

d) An order that Respondent show cause at this hearing why the Child should not be returned to Italy, and why such other relief requested in this Petition should not be granted;

e) A final judgment ordering that the Child be returned to Italy, where—consistent with the Hague Convention—an appropriate custody determination can be made by an Italian court under Italian law;

---

[16] The grounds for items (a)–(c) are set forth in Mr. Moretti's concurrently filed Application for *Ex Parte* Temporary Restraining Order and Scheduling of Expedited Preliminary Injunction Hearing. Respondent's service address and the Child's full name will be provided in a sealed filing as necessary to effectuate item (a)(iii).

f)  An order requiring that Respondent pay Petitioner's expenses, including court costs, legal fees, or other care during the course of proceedings in the action, and transportation costs related to the return of the Child;

g)  An order that Respondent sign all necessary forms and make necessary arrangements to allow the Child to return to Italy; and

h)  Any such further relief as may be just and appropriate under the circumstances of this case.

Dated: March 16, 2023                    Respectfully Submitted,

/s/ Mia L. Falzarano
Mia L. Falzarano
  State Bar No. 24105847
  Mia.Falzarano@alston.com
Christian Sweeney (pro hac admission pending)
  State Bar No. 24121159
  Christian.Sweeney@alston.com
Chris Thomson
  State Bar No. 24125433
  Chris.Thomson@alston.com
Sidney Webb
  State Bar No. 24131745
  Sidney.Webb@alston.com
**ALSTON & BIRD LLP**
2200 Ross Avenue, Ste. 2300
Dallas, TX 75201
(214) 922-3400 – Telephone
(214) 922-3899 – Facsimile

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare that I have read the foregoing VERIFIED COMPLAINT AND PETITION FOR RETURN OF CHILD. I declare under penalty of perjury under the laws of the United States that the factual allegations in the foregoing are true and correct.

Executed this 15th day of March, 2023.

_____
Carlo Moretti