IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **CARLO MORETTI,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. **3:23-CV-0586-L** |
| | § | |
| **GIGLIANNE CAROLLINNE** | § | |
| **SEVERINO BRAGA,** | § | |
| | § | |
| Respondent. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Petitioner Carlo Moretti's ("Mr. Moretti" or "Petitioner") Verified Complaint and Petition for Return of Child ("Petition") (Doc. 1), filed March 16, 2023. The court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure[1] following a bench trial held on April 25, 26, and 27, 2023, at which Petitioner and Respondent Giglianne Carollinne Severino Braga ("Ms. Braga" or "Respondent") were represented by counsel. The court by order (Doc. 46), dated May 15, 2023, stated that a final hearing would be held on May 22, 2023. Since issuing that order, the court, upon further reflection, **determines** that no additional evidence or argument is necessary for the court to render its final decision in this case; **holds** this conference to announce its decision; **issues** this Memorandum Opinion and Order granting the Verified Complaint and Petition for Return of Child; and **orders**

---

[1] In preparing this memorandum opinion and order, the court carefully considered the trial testimony and exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Rule 52). In accordance with that standard, the court has not set out its findings and conclusions in "punctilious detail" or "slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis." *See id.* The court instead has limited its discussion to those legal and factual issues that form the bases of its decision. *Id.*

**Memorandum Opinion and Order – 1**

that the child, A.M., be **returned** forthwith to Italy and to the custody of her father, Petitioner Carlo Moretti.

## I.      Procedural Background

This case involves the alleged wrongful removal or retention of a child under the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc., No. 99-11, which is implemented in the United States through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9003 *et seq*. Petitioner brought this action on March 16, 2023, requesting that the court order the return of his four-year-old child, A.M., to her "habitual residence" of Italy. In his Petition, Mr. Moretti contends that he and Respondent, his former girlfriend, are the parents of A.M. and that Respondent wrongfully removed or retained A.M. in the United States in January 2022. He alleges that Ms. Braga violated his custody rights under Italian law and the parties' custody agreement when she removed A.M. from her habitual residence in Italy and permanently relocated to the United States.

Mr. Moretti seeks an order requiring Ms. Braga to immediately return A.M. to Italy. According to Mr. Moretti, Italian civil law and the parties' draft custody agreement give him custodial rights over A.M.; A.M. was a habitual resident in Italy since her birth until her wrongful removal from Italy or retention in the United States by Ms. Braga; and he was exercising his custodial rights at the time of the wrongful removal or retention.

On the day he filed his Petition, Mr. Moretti also filed an Emergency Application for Ex Parte Temporary Restraining Order and Scheduling of Expedited Preliminary Injunction Hearing ("TRO Application") (Doc. 3), requesting that the court: (1) issue an *ex parte* order immediately prohibiting the removal of A.M. from the court's jurisdiction and requiring the turnover of the child's travel documents; (2) set the matter for an expedited hearing that is a consolidated trial of

the action on the merits; (3) order Respondent to show cause at the hearing as to why A.M. should not be returned to Italy; and (4) enter a final judgment after an expedited trial on the merits, ordering that A.M. be returned to Italy for an appropriate custody determination by an Italian court.

On March 17, 2023, the court granted Petitioner's TRO Application and ordered Ms. Braga to turn over all travel documents for her and A.M., provide current contact information to the court, and maintain daily communication with Mr. Moretti during the pendency of this matter. *See* Doc. 7. By the same order, the court set the hearing for a preliminary injunction and expedited trial on the merits, requiring Respondent to show cause as to why A.M. should not be returned to Italy as her habitual residence. On March 20, 2023, the United States Marshals Service served Respondent with the Petition, TRO Application, and the court's order, and collected the travel documents at that time.

Mr. Moretti filed an unopposed motion to continue the merits hearing and extend the TRO on March 24, 2023, which the court granted and reset the hearing for April 13, 2023. Ms. Braga then filed a Motion for Continuance on April 9, 2023, asking for more time to prepare her defense. The court held a telephonic hearing on April 11, 2023, in which it heard arguments from the parties. The court then entered an order: (1) granting the continuance and resetting the trial to begin on April 25, 2023; (2) granting a Preliminary Injunction that extended the TRO's provisions; (3) directing Respondent to reimburse Petitioner for his travel expenses, not to exceed $1,500; and (4) denying Respondent's request for Petitioner to submit to drug testing, with an admonition that any future request must be accompanied with a detailed affidavit of facts supporting the request. In the same order, the court set the case for trial and directed Ms. Braga to file an answer to the Petition that included any defenses she may have to Mr. Moretti's claim for wrongful removal or retention and return under the Convention.

On April 22, 2023, Ms. Braga filed her Answer in which she denied the allegations in the Petition. On the eve of trial, April 24, she filed an Amended Answer (Doc. 33), to which Petitioner objected and moved the court to strike. Petitioner argued that the Amended Answer, which Respondent filed late and without first seeking leave of court by showing good cause, prejudiced Petitioner's response because he relied on the first Answer to prepare for trial. Petitioner asserted that the Amended Answer alleged new facts and a new affirmative defense, the well-settled defense. Petitioner asserted that the untimely filing prejudiced his inability to rebut the new facts and well-settled defense.

On the first day of trial on April 25, 2023, the court heard arguments from both parties and denied the motion to strike, finding that Petitioner's trial brief, which he filed before the Amended Answer, addressed all of the Convention's recognized affirmative defenses in full. As such, Petitioner had already contemplated and prepared a rebuttal to the well-settled defense. The court further found Petitioner would not be prejudiced because it allowed him to offer new exhibits and witnesses, including witnesses who would require the court's permission to offer testimony by videoconference. Accordingly, the court denied Petitioner's Motion to strike Respondent' Amended Answer.

In her Amended Answer, Respondent contends that Petitioner cannot establish a prima facie case necessary to show that the purported custody agreement is not a formal and binding agreement with Mr. Moretti and asserted four affirmative defenses. Specifically, Ms. Braga contends that she has affirmative defenses under Article 13 of the Convention that would allow A.M. to remain in her custody in the United States. Ms. Braga contends that a return to Italy and Mr. Moretti's care would subject the child to a grave risk of physical or psychological harm or otherwise place her in an intolerable situation. Ms. Braga also objected to returning A.M. to Italy

because Petitioner consented or acquiesced to A.M.'s retention in the United States. Additionally, Ms. Braga asserts that A.M. is well-settled in the United States, as she resided here for more than one year before this action was filed. Finally, Ms. Braga argued that A.M., as an American citizen, has a right to reside in the United States and should therefore not be forced to return to Italy.

On April 25, 26, and 27, 2023, the court conducted a bench trial regarding Mr. Moretti's Petition under the Convention for the return of A.M. and Ms. Braga's affirmative defenses to the Petition. The court heard testimony from Ms. Braga and Ms. Jill Braga ("Ms. Jill"), and, with the assistance of an Italian-speaking interpreter, testimony from Mr. Moretti, Ms. Antonia Mantiero, and Ms. Alessandra Moretti. In addition to witness testimony, the parties presented documentary evidence and arguments during the bench trial through their counsel, and Petitioner filed a pretrial brief in support of his position; Respondent did not file a pretrial brief. The court preadmitted Petitioner's Exhibit Nos. 1 through 5, and 7 through 27; and Respondent's Exhibit Nos. 5 through 8, 10, 17, 18, 19, 21, 22, 23, 25, 41, and 42. The court preadmitted Petitioner's Supplemental Exhibits Nos. 28 through 35, related to the well-settled defense.

During the course of trial, Mr. Moretti offered Petitioner's Exhibit No. 6, the draft custody agreement. Respondent objected to admission of the Agreement as unreliable and non-binding because it had not been finalized with the Italian judicial system and therefore carried no legal effect. The court admitted Petitioner's Exhibit No. 6 over Respondent's objections, finding that her objection went more to the weight of the exhibit as opposed to its admissibility. Petitioner also offered into evidence a demonstrative exhibit showing a line-item budget for Respondent's March 2023 income and expenses, but the court denied the exhibit as unnecessary. Respondent offered a video of one of the parties' arguments as Respondent's Exhibit No. 43, to which Petitioner did not object; the court admitted the exhibit after Respondent provided sufficient authentication.

The facts contained herein are either undisputed, or the court has made the finding based on the credibility or believability of each witness. In doing so, the court considered all of the circumstances under which the witness testified, including: the relationship of the witness to Petitioner or Respondent; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail. When necessary, the court comments on the credibility of a witness or the weight to be given to a witness's testimony. To the extent any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

## II.      Findings of Fact

### A.      Witness Credibility and Weight Given to Testimony

During the course of the bench trial, the court had the opportunity to observe at length the demeanor of the witnesses and assess their credibility. Respondent was the first witness to testify, called in Petitioner's case-in-chief. She provided extensive testimony regarding her relationship with Petitioner and the events that transpired after A.M.'s birth until the trial. Much of her testimony regarded matters that are either immaterial or only somewhat relevant to Petitioner's claim or her defenses.

Overall, Ms. Braga was an emotional and reluctant witness who gave conclusory answers but was unable to provide the underlying facts. When presented with follow-up questions from

counsel or the court, she displayed a demeanor such that, in her mind, her conclusory answers were sufficient, and the court or counsel should not probe deeper for facts. As such, she was unable to recount specific events or provide detailed facts regarding significant events—even those events that she alleged occurred—in response to direct and cross-examination. Many of her responses were nonresponsive to the question asked. Her inability to readily answer factual questions posed to her causes the court to question her overall ability to recall key events. Additionally, when pressed for detailed facts, such as dates and locations of key events, or physical harm she alleges that she suffered, she gave testimony that conflicted with her written statements to the court, which she signed under penalty of perjury.

The second witness was Mr. Moretti, who, as his first language is Italian, testified through an interpreter. This, however, did not affect the court's ability to observe his demeanor and assess his credibility. His responses were most often direct to the question asked, and he provided details of events. Further adding to his credibility was his ready admission of compromising or unfavorable facts. He answered those questions without hesitation and with appropriate remorse and shame. Overall, Petitioner was more credible and believable than Respondent. He came across as honest and forthright. He was articulate and answered questions on direct examination and cross-examination without hesitation and with specificity by providing dates and detailed testimony regarding events that occurred over a six-year period. As a result, the court found his version of events, that transpired before and after this case was filed, to be credible and reasonable. Because the court found Petitioner to be more credible, the court attributed more weight to his testimony than Respondent's testimony.

Given the level of factual detail and consistency in Petitioner's testimony, the court also attributed more weight to the testimony of the witnesses who corroborated that testimony,

including both parties' mothers—Ms. Mantiero, and Ms. Jill—and Petitioner's sister, Ms. Moretti. All three fact witnesses testified to their personal knowledge of the parties' relationship and A.M.'s living conditions in Italy. Each witness responded to questions from counsel and the court without hesitation. Although Ms. Jill at times struggled to describe the facts of key events, the court found that this was likely because it appeared that English was not her first language. When she did communicate factual details, they were consistent, plausible, and descriptive, and therefore credible.

### B.     The Parties' Relationship and Residency in Italy

Mr. Moretti is an Italian citizen and resides in Vicenza, Italy, with his family. Ms. Braga was born in Brazil and moved to the United States when she was five years old; she is a dual citizen of both countries. She lived in the United States until she moved to Italy in 2017 to be in a relationship with Mr. Moretti. The two met in 2017 on an online dating application and met in person later that same year in Portugal. Soon after, Ms. Braga and Mr. Moretti resided together in Milan, Italy, and planned to build a life together there while he supported her fledgling modeling career. The couple was exploring pathways to get Ms. Braga legal residency when, six months after she moved there, Ms. Braga became pregnant with A.M. The couple then moved to nearby Vicenza to live in Mr. Moretti's home in his family's apartment complex. Members of his family, including Ms. Mantiero and Ms. Moretti with her two children, owned six units of the complex and lived there in close proximity to one another, interacting on a daily basis.

In Vicenza, Mr. Moretti provided housing and all of the couple's financial needs, and also gave Ms. Braga money to start entrepreneurial activities in fashion and microgreens because her residency status prevented her from pursuing formal employment. Her businesses were not successful, and she relied upon others, including Mr. Moretti and her family, for financial support

throughout her time in Italy. Mr. Moretti is the owner and operator of a mobile application development and design company that employs roughly 40 individuals in three international offices, to which he often travels. In 2022, he earned €100,000 before taxes.

Mr. Moretti took Ms. Braga to prenatal doctor's appointments, provided financially for her medical care, and was present at A.M.'s birth. A.M. was born in Vicenza on December 6, 2018, and lived in the apartment there with both parents for the first 18 months of her life. A.M. had daily interactions with members of the Moretti family who lived in the apartment complex, including her paternal grandmother, Ms. Mantiero, her aunt, Ms. Moretti, and cousins, Ms. Moretti's children. The extended family was close to A.M. and regularly acted as a caregiver for her. Ms. Moretti described the families' home as safe with close relationships between family and friends who have children.

### C.    The Couple's Contentious and Troubled Relationship

The couple's relationship, however, began to deteriorate while they lived in Vicenza. Ms. Braga attested that Mr. Moretti "put darkness in [her] life," which she explained meant that while she with him, she was subjected to his wishes, was unable to create a successful business, or have relationships. He was often not home because he left for work in the morning and did not return until late, often after spending time with friends. On the weekends, he slept late because he was tired from work and a party lifestyle. Ms. Braga alleged that Mr. Moretti daily used cocaine when he was away from the home, and that his drug use caused him to be unable to care for himself or A.M. While she did not know if he currently used cocaine, she testified that she last knew of his use in 2021 before she and A.M. left Italy.

Mr. Moretti admitted that he first used cocaine in 2001. He further admitted that in 2017, 2018, 2019, 2020 and 2021, he used cocaine on more than one occasion, and that prior to

Respondent's pregnancy, they both used cocaine. He testified that he never used cocaine in front of A.M. and that he was never under the influence of cocaine in her presence. He denied ever using cocaine at his home, workplace, or in the United States. He further testified that he did not use cocaine daily, which would have a disastrous effect on his company's success and his employees. His sister, Ms. Moretti, testified that she never saw him use cocaine, and that he could not be a drug addict because he is athletic and a businessman, and therefore regular drug use and his lifestyle are not compatible.

As their relationship deteriorated, the couple began to argue more. Their arguments often escalated into yelling and screaming, and sometimes into physical aggression. Ms. Braga alleged that Mr. Moretti physically abused her and pushed her when they argued. Through extensive questioning, she described three incidents in which the couple became physical. The first was an argument involving a laptop that Mr. Moretti gave Mr. Braga for her business pursuits. He grabbed the computer, and she pulled it in the opposite direction. Mr. Moretti said that the laptop slipped out of his hands and hit her in the chest; Ms. Braga said that he hit her in the chest with it, leaving bruises.[2] Ms. Mantiero and A.M. were present for the incident.

The second incident of physical aggression involved an argument in which Mr. Moretti tried to grab A.M. out of Ms. Braga's arms and in doing so, tore her shirt. During that argument, she tried to close a door to shut him out and inadvertently hit her own arm, which caused a bump.

The third incident was presented in part through video taken surreptitiously by Ms. Braga with a cellphone while the couple was on vacation. Under cross-examination, Mr. Moretti testified that the argument started when their car tire became flat for the second time that day. Mr. Moretti

---

[2] Respondent agreed that, although her Amended Answer attested that she had a scar on her chest because of the laptop injury, she did not have scars but was bruised. She conceded that she knew the verified Amended Answer misstated that fact but signed despite this fallacy because she did not have time to micromanage her attorney's writing.

began to unload the car to change the tire and asked for her help. When Ms. Braga refused, he admitted that he became frustrated and grabbed her arm to try to pull her from the vehicle. In the video, both parties can be heard yelling and, although not clear, both appeared to be physically aggressive before Mr. Moretti grabbed her arm. He pulled on her arm for a few seconds without pulling her from the car; A.M. was in the vehicle at the time.

Mr. Moretti conceded that both parties pushed each other during angry arguments but denied slapping or hitting Ms. Braga. He alleged that she slapped and punched him but without any serious injury. He also conceded that, unfortunately, A.M. was present for these altercations. Ms. Braga testified that he was never physically aggressive with her while she was pregnant with A.M. and that he was never physically aggressive with the child.

Ms. Braga also alleged that Mr. Moretti was emotionally abusive and described him as a narcissist who was impatient with her and subject to outbursts of anger both at home and in public. During their arguments, both parties raised their voices, yelled, and insulted each other. She described their frequent arguments as being "just like animals shouting at each other." She testified that their arguments included Mr. Moretti taunting her and that he told her to commit suicide so that A.M. would be with him; he denied making such a statement. He testified that during his arguments with Ms. Braga, during the course of their relationship and before trial, she threatened to tell others that he used drugs and was violent to damage his reputation.

Both parties' family members testified that the couple had a contentious relationship. Ms. Jill confirmed that the home was tense because of the fighting during two multi-week visits to the couple's home in 2018 and 2019. She observed Mr. Moretti's impatience and absence from the home. During her first visit, Ms. Jill said that, due to the tension caused by constant arguments, she and Ms. Braga spent the majority of her visit in a separate rented home, paid for by Mr. Moretti.

He also paid for their restaurant meals when Ms. Braga did not have the funds. Ms. Jill recounted one evening on her second visit when she and the family went to a dinner and dancing event late into the evening. There, Mr. Moretti demanded multiple times that Ms. Braga let him have A.M., but she refused, either because she was breastfeeding or the child was sleeping. Mr. Moretti became angry and yelled, causing a scene in which bystanders became quiet and uncomfortable. When Ms. Jill and the family left, Ms. Jill stated that he angrily drove home, which caused her to feel unsafe.

Mr. Moretti's family often heard the couple yell. Ms. Mantiero and Ms. Moretti testified to hearing both parties argue about family life, child rearing, healthcare choices, Ms. Braga's vegan diet, and her disbelief of vaccines and traditional medicine, as well as Mr. Moretti's funding of her business pursuits. Ms. Moretti described the arguments as two adults raising their voices in a disagreement typical of a relationship that is no longer working. Ms. Moretti would intervene in the couple's arguments to remove A.M. from the situation or to act as a mediator between the two. Both Ms. Mantiero and Ms. Moretti denied ever seeing Mr. Moretti physically abuse Ms. Braga or A.M. Ms. Braga testified that Ms. Mantiero slapped her and tried to push her down a flight of stairs; Ms. Mantiero denied doing so.

### D.    The Parties' Separation and Respondent's Moves

The lockdowns imposed by the Italian government to combat COVID-19 in 2020 exacerbated the couple's relationship problems. Ms. Braga testified that during lockdown, living with Mr. Moretti became unbearable, and A.M. became a "little monster" who began to emulate his angry behavior. These conflicts led to the end of their relationship in May 2020. At that time, Mr. Moretti placed a hold on A.M.'s passport to prevent Ms. Braga from taking her out of the country without his permission.

When the two separated, Ms. Braga and A.M., who was two years old at the time, moved to an adjacent apartment in the Moretti family complex owned by Mr. Moretti's aunt. Mr. Moretti arranged with his aunt to allow Respondent and A.M. to live there without paying rent, and he continued to provide financially for all of their living expenses, medical care, and daycare that A.M. began attending Monday through Friday to have social interactions during the lockdown. He continued to see A.M. daily and cared for her unsupervised and without any objection from Ms. Braga. After one year in the adjacent apartment and a brief residence in an apartment off of the Moretti property in Vicenza, Ms. Braga and A.M. moved to Milan in September 2021 into an apartment leased in Mr. Moretti's name and paid for by Ms. Braga's family.

### E.    The Custody Arrangement and Draft Agreement

Once Ms. Braga and A.M. moved off the Moretti family property, the parties fell into a regular weekly custody routine. In Milan, that routine provided that Mr. Moretti would visit A.M. Thursday through Sunday each week, staying in a separate room of the Milan apartment. Every other weekend, he took A.M. back to Vicenza on unsupervised visits with him and his family. He continued to support financially both Respondent and A.M., and he paid for A.M.'s medical care and nursery school, where she had friends.

Mr. Moretti began working with attorneys to formalize their visitation arrangement based on their custody routine, and on December 9, 2021, both parties signed a custody agreement ("the Agreement") (Petitioner's Exhibit 6). The Agreement set out Mr. Moretti's custody as the ability to "stay with his daughter every week from Thursday evening until Saturday morning, being able to stay overnight in the Milan apartment, and alternating weekends from Friday evening when he takes her to Vicenza until Sunday evening when her mother comes to pick her up in Vicenza."

Ms. Braga believed that Mr. Moretti's mother was often A.M.'s primary caregiver on the weekend visits in Vicenza.

Ms. Braga, however, did not think that she could live a successful life in Italy because of her unsuccessful businesses and the country's COVID-19 restrictions. She chose to not get the COVID-19 vaccine and would not consent to A.M. receiving it when she was old enough to do so. Soon after moving to Milan, Ms. Braga began to make plans to move with A.M. permanently to the United States. Ms. Braga admitted that she lied to Mr. Moretti about the true nature and duration of their travel to gain his permission to take A.M. from Italy because she knew that he would never consent to A.M.'s permanent removal. She told him that she wanted to take A.M. to the United States for two weeks to visit her family in Texas and New York over the Christmas holiday. She provided plane tickets with a departure date of December 16, 2021, and a return on January 3, 2022. Believing their travel was a two-week vacation, Mr. Moretti gave his consent and accompanied Ms. Braga to the Vincenza police station to remove the hold on A.M.'s passport.

The couple's custody Agreement had not been filed with the Italian courts before Ms. Braga took A.M. to the United States; Mr. Moretti planned to file the Agreement with the court after the Christmas holiday. He testified that the terms were finalized, but Ms. Braga testified that the terms were not final for her because she did not intend to live in Italy. According to Ms. Braga, had she intended to stay in Milan and be bound by the Agreement, she would have made changes to separate A.M. from Mr. Moretti, although she could not specify what those changes would have been and testified at other times that she wanted A.M. to have time with her father. She signed the Agreement "under duress" because, if she did not, Mr. Moretti would not consent to her taking A.M. to the United States. She signed the Agreement to make him "feel comfortable" with A.M.'s travel, knowing that she and A.M. would not return. At that time, A.M. had **only** lived in Italy.

**F.      Respondent's Retention of A.M. in the United States**

While in the United States for those two weeks, Mr. Moretti had daily contact with A.M. On January 3, 2022, the date of her purported return to Italy, Ms. Braga texted him a picture of A.M. in a bed at the time they were supposed to be flying back to Italy. When Mr. Moretti asked why they were not at the airport, Ms. Braga called him and told him of her intention to remain in the United States with A.M. He was shocked and hung up the phone.

She then sent a long WhatsApp message explaining her decision. She said, "I write to you as I return back to the US w [sic] [A.M.]. I'd like to ask your forgiveness and I believe you need mine too." She told him, "I have found an international lawyer working w [sic] American mothers, [A.M.] is in physical and psychological danger due to nonsensical and non scientific covid restrictions, we are a refuge [sic] family escaping forced vaccines for profit."[3] Ms. Braga further explained that she "speak[s] like many escaping and migrating to free red states as my life has become unlivable in Italy," and said that she could not allow A.M. to "be experimented on" with the "experimental MRNA" COVID-19 vaccine. She said that "[A.M.] won't be our sweet little girl for long, just submissive, docile, shy, obedient little governments [sic] child if we stayed in Europe." She also said, "I ask for no money from you not even [A.M.]'s allowance just your patience and love." She encouraged him to visit and "spend a great deal of your time in the US these next few years w [sic] us." At the end of the message, she asked him to marry her. She testified that she did not accuse him of abuse or drug use then to prevent him from taking legal action to bring A.M. back to Italy.

---

[3] Ms. Moretti offered layperson testimony from her experience as member of the European Parliament since 2019 and her service on that governmental body's committee that managed responses to the COVID-19 pandemic. The Italian government required the COVID-19 vaccine for healthy adults working in certain fields, such as healthcare or teachers, the elderly, and adults with certain medical conditions. The Italian government at no time required the vaccination of healthy adults or children, and it did not restrict domestic travel based on vaccination status.

Mr. Moretti opposed A.M.'s retention in the United States and asked her to bring A.M. back. For the first few days, he was in a state of shock and hoped that when the Italian government removed its COVID-19 restrictions, Ms. Braga would return. He suspended his monthly financial support until May 2022. A.M. has remained in the United States since December 16, 2021.

### G.        Respondent and A.M.'s Residence in the United States

When Respondent and A.M. first arrived in the United States, they stayed with Respondent's family in Irving, Texas. Then in January 2022, Ms. Braga and A.M. traveled by airplane to Hillsdale, New York, to live with Respondent's aunt. They stayed in an unused bedroom of the aunt's adult child. By July 2022, however, the adult child returned home, and Ms. Braga and A.M. moved from the residence. Ms. Braga rented a car to drive to Texas, camping in a tent at campgrounds for a few nights along the way. Petitioner provided financial support during the trip, including responding to Ms. Braga's requests for gas money. Once back in Texas, Ms. Braga and A.M. camped at Cedar Hill State Park for a week before moving into a studio apartment in Dallas.

In Dallas, A.M. attends preschool on Friday, and she goes to dance and swim classes on Tuesdays. Aside from preschool and classes once per week, A.M. does not have regular activities in Dallas. As for A.M.'s legal residency, Respondent has begun the process to get A.M.'s United States citizenship formalized, but that is not yet completed. She testified that she believed that A.M. would not be deported because she was a small child with a parent who is an American citizen. In addition to the regular monthly financial support that he restarted paying in May 2022, Mr. Moretti pays for A.M.'s health insurance.

In the United States, Respondent restarted her entrepreneurial activities. She started a hemp scrunchie business that she left behind when she left New York. Since returning to the Dallas area

in July, she started a microgreens business the following October, and although she has begun to see financial success, her business provided no take-home pay in March 2023.

H.      **Petitioner's Visits to the United States**

While Respondent and A.M. remained in the United States, Petitioner visited on four occasions. He visited the two in New York, first in February 2022, and then again in April and May 2022. After Respondent and A.M. moved to Texas, he visited in August and December 2022. On each visit, the parties and A.M. stayed together peacefully as a family, either at a hotel or Ms. Braga's residence, and included multiple days that Mr. Moretti had sole custody of A.M. On his December visit, he stayed at Ms. Braga's apartment, and she gave him a key. Although she testified that she believed Mr. Moretti would not use illegal drugs in the United States, he testified that during his visits, he and Ms. Braga smoked marijuana together at least twice while A.M. was in the same room. Ms. Braga did not refute this testimony, although she had an opportunity to do so.

On each of the first three visits, Mr. Moretti asked Ms. Braga to bring A.M. back to Italy. Although she refused to return, Ms. Braga wanted A.M. to have an active relationship with him. Because she would never return to Italy, the parties discussed finding a different location to build a joint life together in a place where COVID-19 restrictions were less harsh. They considered the possibility of a sham marriage as a way for him to obtain legal residency in the United States, but he decided against moving.

Petitioner arrived in Texas on April 8, 2023, for the first trial setting of this action. For the first two nights of his visit, both parties and A.M. stayed at his Airbnb. Ms. Braga then returned to her apartment, leaving A.M. unsupervised with Mr. Moretti for two more nights before his mother and sister arrived on April 12th. A.M. remained with the Moretti family until April 16, 2023. Both parties agreed that during this visit, A.M. was at no risk of harm. Respondent believed that A.M.

was safe because Ms. Mantiero and Ms. Moretti were present, and because she believed he would not use drugs in the United States. She also stated that if A.M. returned to Italy, her basic needs would be met by Mr. Moretti and his family but not at the same level as if Ms. Braga, as her mother, provided the care.

The parties fought over custody of A.M. in the week before trial,[4] and although they had previously agreed that Mr. Moretti would pick up A.M. from preschool on Friday and have custody of her until the following Monday, Ms. Braga changed her mind. She picked A.M. up on Friday and informed him that he would only see A.M. on her terms. Mr. Moretti opposed the change and testified that A.M. knew the plan for her to be with her father. Instead of weekend custody, Respondent met Mr. Moretti on Sunday for an hour-long visit at an ice cream shop.

That visit, however, ended with an incident that Mr. Moretti filmed (Petitioner's Exhibit No. 35). The video shows Ms. Braga trying to put A.M. in car seat while A.M. is screaming, crying, and trying to run to Mr. Moretti, who is standing away from the car in the parking lot. The parties are fighting, and Mr. Moretti tells A.M. that Ms. Braga will call the police for him; Ms. Braga testified that she made that statement because he was filming. In the video, both parties, accuse the other of trying to manipulate A.M. After a few minutes, Mr. Moretti calms A.M. down, and the two say goodbye before Ms. Braga drives away. Respondent alleged that Mr. Moretti deliberately created the incident and then filmed it disparage her at trial. He argued that he made the film to show that Respondent upset A.M. by changing their custody agreement.

---

[4] After the close of evidence, Petitioner moved the court to enter an order that dictated the parties' custody schedule during the remainder of Petitioner's time in the United States. Petitioner asserted that such an order was necessary because Respondent had deviated from their previous agreement the prior week and picked up A.M. from her preschool when the parties had previously agreed that Petitioner would get her to have custody over the weekend; Respondent confirmed that she did so because she no longer want Petitioner to have unsupervised time with the child. The court granted Petitioner's request and entered a custody order on the parties' agreement.

I.       **Petitioner's Legal Efforts to Effect A.M.'s Return to Italy**

Petitioner filed this action 14 months after Ms. Braga retained A.M. in the United States. Petitioner testified that he chose not to take immediate legal action out of his fear that Ms. Braga would relocate with A.M. or face criminal kidnapping charges, leaving A.M. without her mother. He believed that Ms. Braga would voluntarily return to Italy with A.M. as the COVID-19 restrictions were lifted. Respondent also testified that she discussed building a life with Petitioner in a location outside of Italy and did not complain about his cocaine use to delay his taking legal action against her.

After Mr. Moretti's last visit with A.M. in December 2022, however, he was convinced that Ms. Braga would not return to Italy under any set of circumstances. When Mr. Moretti returned home to Italy, he filed a request for the return of A.M. under the Hague Convention with the Italian Foreign Affairs Ministry. He filed this action on March 16, 2023.

At trial, Respondent confirmed that although she is legally able to return to Italy with A.M., she will "never ever" go back, even if it means giving sole custody to Mr. Moretti. She testified that under no circumstances would she return to Italy solely because Italy could restart its COVID-19 restrictions. Ms. Braga maintains that she will refuse any COVID-19 vaccination. She further testified that she believed this action is an attempt to take A.M. away from her permanently because she will not return with her.

III.    **Conclusions of Law**

A.       **Overview of the Applicable Law to Wrongful Removal or Retention Cases**

The Convention was adopted to address the problem of international child abductions in connection with domestic disputes. *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The purpose of the Convention is to "to secure the prompt return of children wrongfully removed to or retained in any

Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Id.* (quoting Convention, art. 1). The Convention is implemented through the ICARA. *Id.* Under the ICARA, state courts and federal district courts have concurrent original jurisdiction over actions arising under the Convention. 22 U.S.C. § 9003(a). A person, who seeks the return of a child wrongfully removed or retained may file a petition for relief "in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." *Id.* § 9003(b). It is undisputed that A.M. was located in Dallas County, Texas, when Mr. Moretti filed his Petition under the Convention. The court therefore has jurisdiction over this action. The Federal Rules of Evidence apply to wrongful removal and retention cases brought under the Convention. *Vazquez v. Vasquez*, No. 3:13-CV-1445-B, 2013 WL 7045041, at *1 n.1 (N.D. Tex. Aug. 27, 2013) (citing cases). Authentication requirements, however, are relaxed. *See* 22 U.S.C. § 9005.

"The return remedy is the central operating feature of the Convention and provides that a wrongfully removed child must be returned to his or her country of habitual residence unless certain defenses apply." *Hernandez v. Garci Pena*, 820 F.3d 782, 786 (5th Cir. 2016) (footnote omitted). The return remedy does not address an underlying custody dispute but instead makes a determination as to where a custody decision should be made. *Id.* Therefore, it is irrelevant under the Convention "whether there is a custody dispute concerning [the] child pending at the time of removal." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004). The Convention's return remedy does not change custody rights that existed prior to the wrongful removal of a child and is not a determination regarding the merits of any custody issue. *Abbott*, 560 U.S. at 9 (citing Convention, art. 19). As the core principle of the Convention, the return

remedy works to "restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court." *Id*. (quoting *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000).

When a child less than sixteen years of age has been wrongfully removed or retained and less than one year has elapsed between the alleged wrongful removal or retention and the commencement of return proceedings, the court in the country to which the child has been brought must "order the return of the child forthwith," unless one of the Convention's limited exceptions applies. *Abbott*, 560 U.S. at 9; 51 Fed. Reg. at 10507. Even when return proceedings are initiated after the expiration of one year, Article 12 of the Convention requires return of the child unless it is shown that the child is settled in his or her new environment. *Id.* If a petitioner shows by a preponderance of the evidence that the removal or the retention of the child was wrongful, the burden shifts to the respondent to prove an applicable affirmative defense. *See* 22 U.S.C. § 9003(e)(1). Accordingly, if Petitioner proves his prima facie case, the court must order A.M. be returned to Italy, unless it determines that one of the Convention's limited affirmative defenses applies.

### B.     Petitioner's Burden of Proof

To establish a claim for wrongful removal or retention under the Convention, the petitioner must establish by a preponderance of the evidence the following three elements: (1) that "the respondent removed or retained the child somewhere other than the child's habitual residence"; (2) that the removal or retention was wrongful in violation of the petitioner's custody rights; and (3) that "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012).

Neither the Convention nor ICARA defines "habitual residence." *See id.* at 310. Finding the habitual residence of the child presents a mixed question of fact and law. *Monasky v. Taglieri*, 140 S. Ct. 719, 730 (2020). A petitioner must establish the child's habitual residence through the totality of the circumstances. *Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020) (citing *Monasky*, 140 S. Ct. at 730). Once established, the court must apply that legal standard to the relevant facts to "determine if the child was at home in the county from which the child was removed." *Id*. A child's presence in a country is deemed "habitual" when her "residence there is more than transitory." *Id*. at 562. Additionally, courts may consider the parents' citizenship and location of any owner property, the parents' shared intention to raise the child in a location prior to removal, the place of residence when the child was born, location of the child prior to removal, and any formal custody agreement between them. *See Smith*, 976 F.3d at 563 (citing *Monasky*, 140 S. Ct. at 730).

A parent's removal or retention of a child is considered wrongful "when he or she removes or retains the child outside the child's country of habitual residence, and this removal: breaches the rights of custody accorded to the other parent under the laws of that country; and, at the time of removal, the non-removing parent was exercising those custody rights." *Appellant*, 394 F.3d at 343 (citing Convention, art. 3). "[R]ights of custody" are "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott*, 560 U.S. at 9 (quoting Convention, art. 5(a)). Pursuant to Article 3 of the Convention, "rights of custody" may arise from operation of law, from a judicial or administrative decision, or from a legally binding agreement. Convention, art. 3.

When no formal custody agreement exists between the child's parents, courts must apply the laws of the country of the child's habitual residence to determine whether the nonremoving

parent had "rights of custody" within the meaning of the Convention. *Appellant*, 394 F.3d at 343. "Article 14 of the [Hague] Convention authorizes the court to take judicial notice of the law of the country of the child's habitual residence without following standard procedures for the proof of foreign law." *Martinez Dona v. Perez Castilblanco*, No. 3:17-cv-02469-L, 2018 WL 928976, at *7 (N.D. Tex. Feb. 16, 2018). Here, Petitioner has conceded that the parties' signed custody agreement (Petitioner's Exhibit No. 6) was not filed with the Italian court or otherwise formalized. The court, therefore, will apply the laws of A.M.'s habitual residence to determine whether Petitioner had rights of custody under the Convention.

To determine whether a petitioner was exercising those parental rights at the time of removal, a court considers the petitioner's conduct at the time of removal or retention. *Larbie*, 423 F.3d at 308 (internal quotation removed). "[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Sealed Appellant*, 394 F.3d at 345 (internal quotation omitted).

### C.    Respondent's Burden of Proof

If a petitioner shows by a preponderance of the evidence that the removal or the retention of the child was wrongful, the burden shifts to the respondent to prove an applicable affirmative defense. *See* 22 U.S.C. § 9003(e)(1). Even if the child has been wrongfully removed, return is not required if the removing parent can establish that an exception under the Convention applies. *Abbott*, 560 U.S. at 22. The Convention provides several narrow affirmative defenses if a respondent "opposes the return of the child." Convention, arts. 12, 13, 20; 22 U.S.C. 9003(e)(2). Specifically, a respondent may argue that: (1) return of the child would subject the child to a grave risk of harm; (2) return would violate the fundamental principles of the returning country; (3) the

proceeding was initiated more than one year after removal and the child is now well-settled in the new environment; (4) the child has sufficient maturity and objects to the return; and (5) the petitioner has consented or acquiesced to the removal. *Id*. Respondent asserts only three of the five recognized affirmative defenses: whether there is a grave risk of harm to the child, whether the child is well-settled in the removal country, and whether Petitioner consented or acquiesced.[5]

    1.  <u>Grave Risk of Harm to the Child</u>

A respondent may show by clear and convincing evidence[6] that there is a "grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b); 22 U.S.C. 9003(e)(2)(A). The level of harm necessary to trigger the Article 13(b) exception must be "a great deal more than minimal." *Sanchez v. R.G.L.*, 761 F.3d 495, 510 (5th Cir. 2014) (citation omitted). The grave risk defense applies to situations when the risk to the child is "grave, not merely serious." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (March 26, 1986). A grave risk or intolerable situation also exists when returning a child would send him or

---

[5] Respondent also asserted a fourth defense not recognized by the Convention: that A.M. is an American citizen and as such, she has a right to reside in the United States. The court takes judicial notice of 8 U.S.C. § 1401(g), which provides that "a person born outside the geographical limits of the United States . . . of parents one of whom is an alien, and the other a citizen of the United States . . ." is a citizen of the United States at birth. Accordingly, the court determines that A.M. is a United States citizen under Section 1401(g) because Ms. Braga is a United States citizen who resided in the United States prior to A.M.'s birth for the requisite number of years. As to A.M.'s citizenship being an affirmative defense to the removal remedy, Respondent did not support this argument with any legal citation to show that this is a viable defense, and the court has found none. As the affirmative defenses in these kinds of cases are narrowly limited by the Convention, the court finds no good cause to expand that list here. Accordingly, the court denies Respondent's asserted defense based on A.M.'s citizenship.

[6] Civil cases are typically decided by a preponderance of the evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-88 (1983). Proving a fact by a "preponderance of the evidence" means showing that the existence of a fact is more likely true than not. *Id.* at 390. Thus, to prove a fact or claim by a preponderance of the evidence, a party must prove that it is more likely than not that his or her version of the facts is true. *Id.* The "clear and convincing evidence standard" is a standard that is "higher than the preponderance of the evidence standard, common in civil cases, but not as high as beyond a reasonable doubt." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citation and internal quotation marks omitted); *Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001). "Clear and convincing evidence" means evidence "so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy." *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 395, n.9 (5th Cir. 2004) (quoting *Travelhost, Inc.*, 68 F.3d at 961) (internal quotation marks omitted).

her "to a zone of war, famine, or disease, or in cases of serious abuse or neglect." *Vazquez v. Estrada*, No. 3:10-CV-2519-BF, 2011 WL 196164, *5 (N.D. Tex. Jan. 19, 2011). The exceptions to return of the child looks for prospective risk, not retrospective. *Sanchez*, 761 F.3d at 509.

Evidence of prior abuse is insufficient, especially when there is conflicting testimony about the alleged abuse. *Edoho v. Edoho*, No. H-10-1881, 2010 WL 3257480, at *5 (S.D. Tex. Aug. 17, 2010). Allegations of spousal abuse are only relevant if the abuse seriously endangers the child. *Sierra v. Tapasco*, No. 4:15-CV-00640, 2016 WL 5402933, at *9 (S.D. Tex. Sept. 28, 2016), *aff'd*, 694 F. App'x 957 (5th Cir. 2017). When the respondent demonstrates a sustained pattern of physical abuse or propensity for violence, particularly if observed by the child, the court may find a grave risk. *Id*. "In contrast, sporadic and isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found not to constitute a grave risk." *Id*. (internal quotes and citations removed). Isolated allegations of harm are more suspect when disputed by the parties. *Id*. Further, when the parents current living situation makes cohabitation unlikely and therefore recurring spousal abuse witnessed by the child unlikely, there is no grave risk of harm. *Sierra*, 2016 WL 5402933, at *9 (internal citation omitted).

Similarly, allegations of drug use by a custodial parent can create a grave risk to the child if respondent shows clear and convincing evidence of drug use that constitutes a future harm greater than would normally be expected with a custodial parent. *See Mendieta Chirinos v. Umanzor*, No. 3:18-CV-02668-M, 2019 WL 2287975, at *8 (N.D. Tex. May 29, 2019) (finding that conflicting evidence of past cocaine possession on three occasions did not meet the standard). Because this exception requires a finding of prospective harm, past acts of drug activity in the home are insufficient to show grave risk of harm. *Sanchez v. Sanchez*, SA-12-CA-568-XR, 2012

WL 5373461, at *11 (W.D. Tex. Oct. 30, 2012), *vacated on other grounds sub nom. R.G.L.*, 761 F.3d 495 (5th Cir. 2014).

    2.  <u>Well-Settled in the New Environment</u>

Pursuant to Article 12, if the petition is filed more than one year after the removal, a respondent may argue that the child is now "well-settled" in his or her new environment. Convention, art. 12; 22 U.S.C. 9003(e)(2)(B). This defense must be established by a preponderance of the evidence. *Id.* To determine if a child is well-settled, courts consider the following factors:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular activities; (6) the respondent's employment and financial stability; and (7) the immigration status of the respondent and child.

*Hernandez*, 820 F.3d at 787–88 (internal citations omitted).

    3.  <u>Consent or Acquiescence of Petitioner</u>

It is also a defense to wrongful removal if a respondent can show by a preponderance of the evidence that the petitioner was "not actually exercising the custody rights at the time of removal or retention," or that the petitioner "had consented to or subsequently acquiesced in the removal or retention." Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B). The court looks to the petitioner's statements and conduct, which may be informal, to determine whether the petitioner gave consent or acquiesced to the removal or retention. *Sealed Appellant*, 394 F.3d at 344-45 (internal citations omitted). "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Id*. (internal citation omitted). When a petitioner consents to removal under the guise of a short-term trip, like a vacation, he or she does not consent to removal or retention.

*Id*. at 341 (finding petitioner did not consent to permanent removal when giving approval for a one-month trip to the United States, as respondent led petitioner to believe).

## IV.   Application of the Law to the Facts

### A. Petitioner's Prima Facie Case

#### 1.   Habitual Residence

The evidence in this case leads the court to conclude that A.M.'s habitual residence is Italy. She was born in Italy and, prior to her removal to the United States in December 2021, had resided only in Italy since her birth. Her father is an Italian citizen whose family resides in Italy, where he was raised and owns property. Prior to A.M.'s move to the United States, her mother also resided there. A.M. attended a nursery school in Milan, where she had friends, and received medical care there. Ms. Braga understood that Mr. Moretti did not want A.M. to leave Italy, which led him to place a hold on her passport.

While the parties contest the finality of the custody Agreement, it is consistent with their prior custody schedule and mutual understanding prior to A.M.'s removal. The Agreement is consistent with the parties' custom that Mr. Moretti would visit A.M. in Milan each week, and then every other weekend, return with her to Vicenza. The Agreement formalized this custom and mutual understanding that A.M. would reside in Italy. Further evidence of this understanding is Ms. Braga's decision to deceive Mr. Moretti to gain his permission for A.M.'s travel to the United States. While Ms. Braga intended to take A.M. to the United States for her to live permanently, she understood that Mr. Moretti did not agree and would not consent. While the parties contemplated making a life together someplace outside of Italy, no discussion of this option occurred before A.M.'s removal, which is the point in time that the court considers when determining the habitual residence.

Based on the foregoing, the court determines that Petitioner and Respondent shared an intent or settled purpose that A.M.'s habitual residence would be Italy. Respondent's removal of A.M. from Italy and retention of her in the United States do not affect the court's resolution of this issue because Respondent's unilateral actions in this regard are insufficient to establish an intent to change A.M.'s habitual residence. Moreover, as herein discussed, there is insufficient credible evidence to support Ms. Braga's conclusory allegations of abuse and illegal conduct—the purported bases for the extrajudicial custody modification. For all of these reasons, the court concludes that A.M.'s habitual residence is Italy. Petitioner has therefore satisfied this element.

2. <u>Wrongful Removal and Retention</u>

Here, the parties do not have a formal custody agreement but rather have a regular practice memorialized in the Agreement that was in the process of becoming finalized with the Italian courts when Respondent removed A.M. Because the Agreement is not a finalized agreement, the court will not consider it when determining the party's rights of possession with respect to A.M. Instead, the court will consider whether Petitioner had rights of custody under the Convention.

Petitioner moved the court to take judicial notice of Italian law (Doc. 24) and attached a translated copy of Civil Code Section 316 transmitted from the Italian Central Authority to the United States Department of State in connection with his Hague Convention application. Judicial notice of foreign law is appropriate in cases arising under the Convention. Convention, art. 14 (providing that to determine "whether there has been a wrongful removal . . . the judicial . . . authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child . . . ."). The court granted the motion and, pursuant to Federal Rule of Evidence 201, took

judicial notice of the relevant foreign law of Italy under Civil Code Section 316, as permitted by Article 14 of the Convention.

Section 316 provides that "[b]oth parents are entitled with parental responsibility and they shall exercise it by mutual agreement . . . . Parents shall decide their child's habitual residence by mutual agreement." The Section further states that "[w]hen both parents have recognized a child who was born out of wedlock, they shall be both entitled to exercise parental responsibility." Accordingly, under Italian Civil Code Section 316, the court concludes that Petitioner had a right to custody at the time of removal. *See Guaragno v. Guarango*, Civ. Action No. 7:09-CV-187-O, 2010 WL 11619709, *6 (N.D. Tex. May 18, 2010) (finding that Italian law dictated that "parents jointly exercise parental authority unless one parent applies for and obtains a court order specifying otherwise."). The parties were not married, and A.M. was born out of wedlock. Both parents have recognized her and are listed on her birth certificate (Petitioner's Exhibit 1), and therefore both are entitled to exercise parental authority and to decide A.M.'s habitual residence by mutual agreement.

While Respondent shares the same joint parental authority, she is not authorized to unilaterally decide to retain possession of A.M. against Petitioner's desires. Respondent's removal and retention of A.M. were therefore wrongful. If Respondent wished to modify the custody agreement with Petitioner, she should have initiated such proceedings and obtained a court ruling beforehand, instead of taking matters into her own hands. The court, therefore, concludes that Petitioner has satisfied this element.

       3.  <u>Petitioner's Exercise of Custody Rights</u>

Pursuant to Article 14 and Petitioner's Motion for Judicial Notice, the court has taken judicial notice of the relevant provisions of Italian law. The evidence shows that Petitioner was

exercising his custody rights under Italian law, as addressed above, by sharing custody of A.M. on his weekly visits to Milan, exercising unsupervised custody biweekly for weekends in Vicenza, paying for her medical care and nursery school, and caring for her needs while she was in his custody. At all times prior to December 2021, Petitioner was exercising his visitation rights, as agreed to by the parties' custom and the Agreement. When Ms. Braga removed A.M. to the United States, Petitioner traveled from Italy to visit her four times. He also initiated wrongful removal proceedings in Italy and the United States, and traveled to the United States to prosecute this action. Simply put, there is no evidence that Petitioner was not exercising his "rights of custody," as that term is defined by the Convention, when Respondent wrongfully retained possession of A.M. and brought her to the United States. *See Abbott*, 560 U.S. at 9 (quoting Convention, art. 5(a)).

Accordingly, Petitioner has satisfied this final element and his burden of establishing, by a preponderance of the evidence, that the removal or retention of A.M. was wrongful. The burden, therefore, shifts to Respondent to prove one of her narrow affirmative defenses.

### B.    Respondent's Affirmative Defenses

In her answer to the Petition, Respondent alleged affirmative defenses arguing that: (1) Petitioner's alleged physical and psychological abuse and drug addiction constitute a grave risk to A.M.; (2) A.M. has signification connections to the United States to be considered well-settled; and (3) that Petitioner consented or acquiesced to A.M.'s removal or retention. Respondent also asserted that as an American citizen, A.M. has a right to reside in the United States, which is a defense not recognized by the Convention and as addressed above, the court will not address.

#### 1. Grave Risk of Harm

Respondent asserts that Petitioner has a history of physical and emotional abuse, as well as cocaine use, such that returning A.M. to Italy will expose her to a grave risk of harm or an

intolerable situation. First, Respondent's difficulty in articulating or producing evidence showing any abuse seriously undermines her claims that abuse was pervasive. Her testimony largely consisted of broad allegations of Mr. Moretti showing aggression and impatience, pushing her during their arguments, and creating a general "darkness" in their home, within the context of the relationship between the two parties. Even when pressed by the court to provide factual details of the alleged abuse, Respondent struggled to recount a specific action or physical harm to her. Her inability to recall basic information as to how she was harmed, when and where it occurred, and what injuries she suffered undermines her testimony. Respondent attempted to explain her lack of detail as an example of the pervasiveness of the behavior, but the court does not find this explanation convincing. Equally not credible was her testimony that Ms. Mantiero physically abused her; that allegation was denied by Ms. Mantiero, whose demeanor and candor the court found more credible.

Further, even if taken as true, Respondent's testimony does not show abuse that rises to the high level of creating an intolerable situation such that removal to Italy with Petitioner constitutes a future harm greater than would normally be expected with a custodial parent. When pressed by counsel and by the court for the facts, she recounted three separate incidents of physical contact and offered as evidence the video of the car incident. That evidence, however, amounts to descriptions of three arguments and physical contact between Petitioner and Respondent, and in which both parties used physical aggression. Two incidents detailed accidental harms incurred during the heat of an argument.

She recounted a time that he "threw a laptop at her chest" and bruised her, although she admitted that her sworn statement in her Amended Answer wrongly stated that she was scarred from the incident, which undermines her credibility. Petitioner admitted that the incident occurred

because the parties argued over his financial support of her businesses and the laptop, and that he attempted to grab the laptop away in anger, which led to it slipping from his hands and hitting her chest. Unlike Respondent, he was able to describe the circumstances of this incident and his role. Mr. Moretti's testimony was credible evidence of accidental physical harm resulting from their intense argument. Respondent's description of a different argument in which Petitioner attempted to grab A.M. from her arms and ripping her shirt is another example of accidental harm. Her only alleged physical harm resulted when Respondent said she closed a door on her own arm.

As for the testimony and video depicting the couple's argument in the vehicle, this, too, fails to show the type of abuse that amounts to a grave risk of physical harm. The video was poor evidence of physical abuse, as it showed only a snippet of the incident, and the court could not get the full picture of what took place. The parties were often obstructed from view, as was any physical contact between them. Moreover, the video showed that both parties yelled and cursed at each other, and it appeared that both were physically aggressive. Further, Petitioner admitted that he grabbed Respondent's arm and tried to pry her from the vehicle, and the video appears to confirm his testimony, including that the contact lasted a few seconds before he stopped. While no cause for approbation, that Petitioner grabbed Respondent's arm and tried to pull her from the vehicle does not support her claim that Petitioner has such a propensity to violence that A.M. will be subject to grave risk of physical harm if returned to his custody in Italy.

Taking these incidents as true, the court is not convinced that Petitioner has a propensity for physical abuse sufficient to constitute a grave risk to A.M. There is no credible evidence that the physical contact between the parties is anything more than "limited incidents aimed at persons other than the child, even if witnessed by the child." *Sierra*, 2016 WL 5402933, at *9.

More importantly, there is no evidence that Petitioner ever physically abused or neglected A.M. Even assuming that the incidents occurred as Respondent testified, they fall woefully short of providing the court with a basis to conclude that A.M. would be subject to a grave risk of harm if returned to Italy to the custody of her father. The limited evidence that Respondent provided amounts to physical aggression between the parties, and, although A.M. was often present, Respondent did not offer any evidence or even allege that Petitioner harmed A.M. Such behavior from adults in a home environment is not laudable and should be avoided, and as Petitioner admitted on the stand, is an unfortunate scene to expose to their young A.M. Even so, examples of past spousal abuse when the parents are unlikely to reunite does not rise to the high level of showing a grave risk. *Id.*

The antagonistic relationship between the parties was apparent in the courtroom. At certain points during the trial, Petitioner would lean forward in his chair at counsel's table to glower intently for extended periods of time across the courtroom at Respondent. This behavior gave credence to some of Respondent's allegations about his temper, aggressive demeanor, and active role in their conflicts. Given the parties' acrimonious relationship, it is highly unlikely that the pair will reunite and expose A.M. to additional examples of physical aggression. There is no evidence that intense arguments or psychological abuse continues absent the presence of both Petitioner and Respondent, as multiple witnesses and the parties themselves testified that they both raised their voices and yelled in anger.

As for any psychological abuse, Respondent testified and offered video evidence in which it appeared that Petitioner deliberately manipulated his daughter to tears. Similarly, Respondent's emotional testimony that Petitioner would taunt her and encouraged her to commit suicide, leaving A.M. with him, shows his ability to be angry and mentally cruel, but, in the context relevant to this

action, the focus of his mental cruelty continues to be Ms. Braga, not A.M. His direct and angry stare at her in the courtroom during trial was an in-person example of that focus. The prospect that he will direct his angry focus to A.M., or emotionally manipulate her, is a remote possibility of a risk of emotional harm, but it is not sufficient to show a grave risk to A.M. A habit of yelling, taunting, or lashing out at family can be predictive of future life, and while not an ideal environment to raise a child, these actions do not rise to the high standard of a grave risk of psychological harm.

As for Respondent's allegations that Petitioner is currently a daily user of cocaine and is unable to care for himself and A.M., there is no credible evidence to support this contention. The sole evidence supporting that is Respondent's testimony and Petitioner's admission of past use. She testified that he used cocaine when the parties lived together, which led to his absence and impatience with her. She assumes he currently uses drugs because of his past use, but Ms. Braga had no evidence to support her belief. Respondent testified that when Mr. Moretti visited A.M. in the United States, he did not use drugs, and as her sole interactions with him since December 2021 were while Respondent was in the United States, she presented no credible evidence of current drug use.

Further, Petitioner admitted that he used cocaine for the first time in 2001, and also used cocaine on more than one occasion in 2017, 2018, 2019, 2020, and 2021. This admission of his past wrongdoing makes his testimony more credible and highlights the dearth of credible evidence of cocaine use in 2022 and 2023. Moreover, Petitioner credibly testified that both he and Respondent used cocaine before she became pregnant, and they both used marijuana in the United States while A.M. was present in the same room; Respondent did not address or rebut this testimony on cross-examination.

Drug use is serious, and exposure to drug use is a serious danger to anyone, even more so to a child who is molded into an adult by observing her parents' actions. What a child sees an adult do, a child will often do, and thus all parents must weigh their actions carefully with this truth in mind. The court does not view the parties' drug use lightly, and neither should they. Taken in this context against the high legal standard under the Convention, however, the use does not rise to create a grave risk of harm to A.M. Petitioner denied ever using cocaine or being under its influence in A.M.'s presence. Further, the court finds it unlikely that Petitioner's drug use in 2019 and 2020 amounted to his inability to care for himself or A.M. The court finds that Ms. Braga's allegation is not credible because Ms. Braga also testified that Mr. Moretti had a successful international business, and his witnesses confirmed that Mr. Moretti's business would not be successful if he were a regular drug user.

Finally, Petitioner's actions in coordinating and permitting Petitioner's visits with A.M. are not consistent with a parent who is genuinely concerned about the welfare of her child with an adult. She repeatedly testified that she wanted any custody arrangement to provide Mr. Moretti with an ability to be a part of A.M.'s life because she wanted A.M. to have a relationship with her father. Any allegation that A.M. would be subject to a grave risk of harm if returned to Petitioner's custody in Italy is undermined by Ms. Braga's permission for A.M. to spend unsupervised time with Petitioner during his visits to the United States, even those visits as recent as the same month as the instant action. Although Respondent asserts a belief that Petitioner is violent, abusive, and unable to care for A.M., she chose repeatedly to coordinate visits and vacations with him, discussed creating a joint living situation outside of Italy, and permit unsupervised overnight visits, up to the week before trial. Ms. Braga's explanation that she did so to avoid conflict is unavailing. Any threat of harm to a child that is outweighed by the threat of conflict with another adult is a an

extremely low threat of harm indeed. Moreover, Respondent's testimony that A.M. was safe because Ms. Moretti and Ms. Mantiero were present, as she testified occurred during Mr. Moretti's custody weekends in Vicenza, is support for the fact that if ordered returned to Italy, A.M. would be safe and her material needs will be satisfied because she will return to the Moretti family home.

Accordingly, the court concludes that neither the incidents of physical arguments, bad temper, or past use of cocaine nor the other grounds relied on by Respondent constitute clear and convincing evidence that A.M. will be subjected to a grave risk of harm or placed in an intolerable situation if she is returned to Italy where she has lived most of his life. The facts of this case simply do not rise to the level of graveness or seriousness required to support a grave risk defense under the Convention.[14]

### 2. Well-Settled in the New Environment

Respondent relies solely on A.M.'s presence in the United States, her Friday preschool, and weekly lessons to support her argument that A.M. is well-settled and should not be forcibly returned to Italy. She asserted that A.M. is too young to attend a traditional school, and therefore her attendance of one-per-week activity is the extent of regular activities that can connect a four-year-old child with her community. She argues that removing A.M. would constitute a cultural shock because she is already accustomed to the United States, and that removal would require her to adapt to the Italian language and culture.

---

[14] Courts that have dealt with allegations of abuse and refused to order the return of children typically involve life-threatening abusive situations that are far more grave than the isolated physical incidents at issue in this case. *See, e.g., Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (reversing order of return when the father had "beat[en] his wife severely and repeatedly in [the children's] presence," and threatened to kill them); *Walsh v. Walsh*, 221 F.3d 204, 219-20 (1st Cir. 2000) (reversing order of return when father was psychologically abusive and had severely beaten the children's mother in their presence); *Rodriguez v. Rodriguez*, 33 F. Supp. 2d 456, 459-60 (D. Md. 1999) (refusing return where child had been belt-whipped, punched, and kicked, and where the child's mother had been subjected to more serious attacks, including choking and breaking her nose).

Considering the relevant factors listed above, the court concludes that A.M. has not formed significant connections to her new environment to be well-settled in the United States. First, considering her age, A.M. is four and one-half years old, and she is still a young child who is not able to form the same level of attachments and connections to a new environment as an older child. *See Lozano v. Alvarez*, 697 F.3d 41, 48 (2d Cir. 2012) (finding that a five-year-old child was "too young to form certain types of connections"). Respondent's argument that returning A.M. to Italy will require her adjustment fails to take into account that for the first three years of her life, A.M. was an Italian resident familiar with the language and customs.

The second factor, which considers the stability and duration of the child's new residence strongly weighs against finding A.M. well-settled in the United States. In the 14 months since her removal, A.M. has had no less than four different residences, some as temporary as a tent in a campground. Further, she has lived in her current home in Texas for less than a year. She has not really had a stable home since she arrived in the United States.

The third and fourth factors consider whether the child attends school consistently, and as Respondent argues, A.M. does attend a preschool every Friday and swim and dance lessons once per week. Although Respondent presented evidence that A.M. will attend more activities beginning this summer, those future plans are not evidence that A.M. has experienced activities that facilitated a connection to Texas. As for Respondent's argument that A.M. is too young to attend a regular school, her young age does not prevent her from attending preschool, daycare, or other activities on a consistent schedule such that she forms a connection with others there. Respondent offered no testimony that A.M. has friendships in her Friday preschool school or close relationships with her family members who reside in the United States, as opposed to the evidence

showing A.M.'s friendships with other children at her Milan nursery school and close relationships with her Italian family.

As to the sixth factor, considering Respondent's economic and employment stability, she showed that while her entrepreneurial activities are beginning to achieve a modicum of success, she did not make a paycheck in March 2023. She has not held any other employment and, as she testified, she does not earn more than her monthly expenses, causing her to rely on Petitioner and her family for financial support.

Finally, the seventh factor for the court to consider is A.M.'s immigration status. Respondent is a United States citizen, and, pursuant to 8 U.S.C. § 1401(g), A.M. is a citizen of the United States as well as Italy. This factor weighs in Respondent's favor because A.M. has legal status to remain in the United States permanently.

Balancing the factors above, the court is not persuaded that A.M. has formed significant connections to her new environment in the United States and thus concludes that she is not well-settled under the Convention such that she should remain in the United States.

### 3. Consent or Acquiescence

Likewise, there is no credible evidence that Petitioner "consented to or subsequently acquiesced in the removal or retention." Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B). To the extent that Respondent argues that Petitioner consented to A.M.'s removal to the United States because he gave consent for the December 2021 vacation, the court finds that this argument is disingenuous, duplicitous, and false. Respondent lied to Petitioner about the nature of the December 2021 travel to the United States to deceive him so that he would consent to the vacation. She acknowledged that he would not consent to permanent removal. As the court detailed above, Petitioner never gave his consent for A.M.'s removal from Italy to the United States. Respondent

cannot make a good faith argument that Petitioner consented to A.M.'s removal. Respondent acknowledged that she lied to Petitioner, which means that she knowingly made a false statement with the intent to deceive or mislead him.

As for acquiescence, Respondent relies upon Petitioner's financial support and visits as showing that he became accustomed to A.M.'s residence in the United States and thereby acquiesced to it. Respondent failed to rebut to Petitioner's evidence that he repeatedly asked for A.M. to return to Italy and never provided a formal acquiescence, such as a signature or legal document. As for his financial support and visits, this is evidence that Petitioner continued to exercise his parental rights and satisfy his financial responsibility to A.M. Further, ample evidence presented by both parties depicted Respondent's precarious financial circumstances that prevented her from independently meeting A.M.'s material needs. Petitioner's financial support was necessary to provide for A.M. and therefore is not evidence of acquiescence to her retention in the United States.

Finally, contrary to Respondent's assertion, Petitioner's twelve-month delay in seeking legal intervention is not evidence that he acquiesced to Respondent's removal and retention of A.M. in violation of his rights of custody. Moreover, he explained that his delay was in part out of a concern for the legal consequences Ms. Braga would face and the effect those consequences would have on A.M., as well as a hope that Ms. Braga would return A.M. when Italy's COVID-19 regulations ended. This explanation is even more availing in light of his repeated requests for A.M.'s return, and Respondent's testimony that she continued to lead Petitioner into believing that she may return to delay him from seeking legal remedies. Her inconsistent position—that she purposefully misled him to delay seeking legal action but his delay in seeking legal action shows

his acquiescence—combined with evidence of his repeated requests for Respondent to return with A.M., undermines any cogent argument in this regard.

For these reasons, Respondent has not shown by a preponderance of the evidence that Petitioner consented or acquiesced to A.M.'s removal and retention in the United States. In sum, Respondent has failed to prove an affirmative defense.

## V.      Request for Fees and Costs

In his Petition, Petitioner requested to recover his attorney's fees and costs incurred as a result of this action but has not, to date, submitted proof of the legal fees or costs he incurred. Regarding the recovery of fees and costs in wrongful removal and retention proceedings under the Convention and ICARA, article 26 of the Convention states that the court "may, where appropriate" order the removing parent to cover all legal and travel expenses of the nonremoving party. *See* Convention, art. 26; *Sealed Appellant*, 394 F.3d at 346. ICARA, on the other hand, requires the court to order the removing parent to pay fees and costs incurred by the petitioner if it finds in favor of the petitioner and orders the return of the child:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title *shall order* the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees . . . and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3) (emphasis added) (formerly 42 U.S.C. § 11607); *Sealed Appellant*, 394 F.3d 346.

The court **believes** that Petitioner is entitled to recover against Respondent all reasonable and necessary attorney's fees and expenses pursuant to 22 U.S.C. § 9007(b)(3); however, the court cannot make a final determination on the issue of attorney's fees and expenses, as the parties have not fully briefed this matter. Accordingly, Petitioner shall file within **14 days** of this Memorandum

Opinion and Order, an application detailing the services rendered and expenses incurred and supporting authority for and documentation of all fees and costs requested. *See* Fed. R. Civ. P. 54(d)(2)(B)(i). Any objections or response by Respondent must be filed within **14 days** from the date of service of Petitioner's submission. Petitioner may file a reply within **seven days** from the date of service of Respondent's objections or response. Unless Respondent is able to establish that the requested award is "clearly inappropriate," the court will enter an appropriate monetary award of attorney's fees and expenses.

## VI.    Conclusion

For the reasons herein stated, the court **grants** the Petition for Return of Child and **orders** that the child, A.M., be **returned forthwith** to Italy and to the custody of her father, Petitioner Carlo Moretti. To ensure there is no delay in returning A.M. to the custody of her father, the return of custody will take place at the conclusion of the in-court conference. The court **orders** that Respondent immediately release and surrender A.M. to Petitioner. **Further, neither Respondent nor anyone on her behalf shall take any action to interfere with or thwart this court's order. If any person interferes with the court's directives herein, such person will be subject to the imposition of severe sanctions, including, but not limited to, monetary sanctions, arrest and possible incarceration for contempt of court.**

The court **retains** jurisdiction over this matter pending A.M.'s return to Italy to the custody of Petitioner and the resolution of any motion for attorney's fees and related costs. Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

**It is so ordered** this 22nd day of May, 2023.

Sam A. Lindsay
United States District Judge